Good morning, your honors. John Burton for the plaintiff, Alan Zanger. I do apologize. I learned today there's no separate elevators for judges in this building. We're all finding our way. The court has mentioned the Rodas decision which came down on March 9th, and I was familiar with it in preparation for today's argument. I find myself in the awkward position of saying the case that I contended was controlling authority in my opening brief in which the defendant said was irrelevant as a counterfeiting case is in fact irrelevant as a counterfeiting case and not controlling authority. I think it's very important to note what the panel decided this week in Rodas. It affirmed the basic principle that Mr. Zanger contends is controlling here today, which is that for the arrest of a specific intent crime, there must be some sort of probable cause as to that specific intent. The original Rodas decision, which has been vacated, said that that evidence was in the Supreme Court. The Supreme Court had it sitting around while it decided Pearson v. Callahan, which made this slight adjustment to the qualified immunity analysis, making the first step of the saucier analysis an optional one. A court can now go directly to the question whether the law was clearly established or not. Then granted and remanded for reconsideration, and we have Monday's slip opinion, very specifically that in the case of making arrests for possession of counterfeit money, there are a whole series of out-of-circuit decisions, none in the Ninth Circuit, but other circuits, which hold that the act of passing money suspected to be counterfeit by itself gives probable cause for the arrest of that offense. And given that out-of-circuit authority, that's exactly what the officers did in that case. I mean, to be frank, I find the Rodas opinion, or at least the underlying issue in the Rodas opinion, a lot more troublesome than this one, because in Rodas, I mean, the whole point of counterfeit money is to fool people, including the people who get it and then pass it on. But here, there were indices of intent, were there not? No, there were no indices. Even though they were wrong. I mean, I think what happened here is, you know, disturbing in many ways, but still, there were indices, some indices, more than simply passing a counterfeit bill. I disagree 100 percent, Your Honor. The officers conducted a relatively thorough investigation before arresting Mr. Zanger, and what they determined negated specific intent. They found out he was a photographer. They found out that he had been at a film site a couple days before that had used false license plates as prompts. He was in a rented car. He was in a car that was validly registered. All these things that he answered all their questions truthfully. It was a city street, not unlike the street that the Pasadena Courthouse is on. It's only actually a few blocks away from that. All of that would negate the fact that he had put these plates on for some sort of fraudulent purpose. But he said, in fact, that he had sometimes manipulated plates for fraudulent purposes, or at least for misleading purposes, and that he had first said that the plates were on the car when he got them, and then he discovered that wasn't true. Now, there was explanations for all of this, but there were some indices of the fact that he wasn't telling the truth. It turned out he was telling the truth. I disagree 100 percent, Your Honor. Number one, in terms of... of intent? Absolutely. There were no indices of intent. What he testified that he did was that sometimes when he parked at film sites, because he knew that the off-duty police officers would run his plates and find out where he lived, he would take them off. He told these officers that. However, this was a rented car. It would make no sense to take plates off of a rented car. Moreover, it would make even less sense to put phony plates over registered plates on a rented car, and then when they ran the plates, they would definitely have a pretext to interfere with his First Amendment activity. So in terms of equating these two things, of not manipulating a plate, but rather taking a plate off while he was parked at a site so that his plates could not be run, that was a totally different situation. In terms of the rented car, if you rented a car, a member of the court, or anyone else, and all of a sudden someone said, hey, they're out-of-state plates on the car, you would immediately assume that they were there when you rented the car. I mean, who checks that? Then when he found out that they were in fact phony plates that were taped over actual registered plates, he said, oh, those must have been put on when I was at other filming on Palmetto Avenue in Pasadena. But that's how things went south, because the officers checked that and were given mistaken information, but were given information that there weren't Virginia plates that were put on, there were Washington, D.C. plates that were put on. And he didn't have Washington, D.C. fake plates, so that story didn't seem to match. No, the story matched exactly, because number one, there was a film shoot at the time and the place that he said he was at, and number two, they were taping plates on, and he didn't say Washington, D.C. plates, he actually said Washington plates. The show is set in Washington, D.C., Virginia plates, Washington plates. The point was that there was a film shoot, he was at the shoot, he knew he was at the shoot, they called, they found out the top plates were used. The question is whether the officers knew he was at the shoot, and when they checked, they found a discrepancy. They found that there was a shoot at the time and place he said where prop plates were put on the car. How come you won't deal with the discrepancy? Between Washington plates, which is taped in the northwest, and the show that is being filmed, set in Washington, D.C., which has Virginia plates, the officer didn't know. They could have used both Washington plates and Virginia plates, or Washington, D.C. plates and Virginia plates. I don't think that is a significant discrepancy. Finally, you admit it's a discrepancy? That the officer said Washington plates when, in fact, there were Virginia plates used, which we know because in the record are the license plates from the show, and that the officer either was aware that they were Washington plates and not aware they were also Virginia plates, or just misremembered. I think it's much more important that there was a shoot and there were plates being put on the cars at the shoot. I think that is much more important. You want to save some time for rebuttal? I would. Just very quickly on the unrelated Monell issue, this is a case where after he was arrested for this felony, for intent to defraud, he was presented this form that the city of Pasadena uses in his jail to waive McLaughlin rights. He refused to sign it and then never got his McLaughlin review, and we contend that that's an independent, that's an outrageous policy to present inmates with, you know, you should give up your rights to due process. It would be like, we're not going to take you to court. You should just agree to be sentenced now. There's no consideration for them to do that, and that the court should rule on that issue as well, and I would like to reserve. Thank you. Thank you for your argument. We'll hear from the city at this time. Good morning, your honor. Frank Remmer of appearing on behalf of the city of Pasadena, as well as the remaining individual officer defendants. For the first time, I've known Mr. Burton a long time, and this is the first time he's ever admitted that the city or this police department has done a thorough investigation. So on that scenario, I think it's a good place to start. However, we do need to, I was not aware of the new roadage decision, and I appreciate the court providing a copy of that. However, it certainly does indicate exactly what the trial judge, in fact, discussed. You know, we're talking about the fact whether or not it's simply sufficient to have a phony license plate on a vehicle, and whether or not that constitutes probable cause. I think... I don't think... No, I understand. Drawing the analysis from what Rodas was basically saying is, is that was it sufficient to have merely to, as the other circuits have decided, merely to pass the phony plate and know what the identity plate, I'm sorry, phony bill, and then have the identity of the person known, that constitutes probable cause, as I read that opinion. As we are looking at this particular case, we have a situation in which a phony license plate was placed on a vehicle, and now we have much more information than what was just provided in those other circuit cases relating to counterfeiting. What reading this record does have the sense that there was some subtext, or some subject or something else going on, because it's... The fact that they even ran that license plate to begin with, I don't understand. I mean, some guy was parked in a spot apparently perfectly legally, and for some reason they ran his license plate. Well, I think it's the record reflects, and as indicated in the facts that set forth in the judge's opinion, in the trial judge's opinion, the... They were, excuse me, he was parked in a legal spot. However, what they were checking on was whether or not he was a crew member. As you will recall with the first question, and he said he wasn't, and then they double-checked whether in fact he was with some of the crew individuals. You want to find out whether somebody was a crew member by asking the person who was running the crew whether he was a crew member? No, I think that a police officer certainly can check because of the fact that it was an out-of-state license plate. I think the declaration of the officer indicates that because it was an out-of-state license plate, they ran it. They ran the plate also based on the circumstances and the fact that Mr. Zanger wasn't in his own admission, was a little annoyed with the fact that he was contacted, etc. So on that basis, they ran it. However, being parked on a public street doesn't give you any privacy rights, and certainly if the plate turns out to be... I think the other part of this that I find somewhat disturbing is that when he came up with the second explanation, I mean, somewhat different from Judge Clifton, it does seem to me that it did. I mean, it was an unusual and unlikely explanation, and when they corroborated, when they checked it out, I mean, exactly that did happen at exactly that place and exactly that time, and the only issue was whether there were Virginia plates instead of Washington plates. Why? Do you think that would have stopped somebody and said, well, you know, to have made up a story that matched that closely, even if there was a slight discrepancy, seems a little unlikely. Well, Your Honor, again, that may be in 2020 hindsight, that may be the case, and as we're all aware, we don't hopefully use 2020 hindsight to judge these probable cause type situations. That's not hindsight. She's talking about, Judge Brizola's talking about that point at which they learned what she just described. That's not hindsight. What was learned at that time, though. He gave the second explanation, they checked it out, it turned out to be entirely correct, with the exception of whether the plate was from Washington, D.C. or one of its surrounding states. I don't think it was that specific, Your Honor, whether it was Washington, D.C. or whether it was Washington. And whether it's Washington, D.C., Washington State, there is a distinctive difference between the plates being from Virginia. And so on that basis. Happened to make up a story that happened to be 90 percent true. Well, Your Honor, this, again, totality of the circumstances. The first time he told us that the plates were were on the vehicle when he rented it. And then we checked that out. You know, I drove up here today in a rental car. I have no idea what kind of plates it has on it. Understood. And somebody could have clapped something on cover up those plates and I wouldn't know about it. And if you asked me what kind of plates on it, I'd say, I don't know. It's a rental car. Understood. However, the information that the the officers received from the rental agent who actually came out to the site, advised them that there's their custom and practice and that they would take the individual, make them do a circle around the vehicle and and and check for dings, dents and whatever. And on that basis would be able to determine whether or not the vehicle had a license plate. Were the officers deposed?  So we don't know what led them to look at this car and check out its license plates. I believe the declaration state, as what was previously discussed, your honor, in the fact that that the individual, the individuals parked, they weren't sure whether or not he was a crew member or whether or not he was a member or whether he was a resident. That was the reason why he was contacted. Were the officers hired by the film company or something? That's correct. They were off to the police. That's what seems bizarre. If you want to know if somebody is a crew member, you ask the guy who's in charge of the crew. Well, they, as a matter of fact, they did ask them, do they know this person? But they didn't. So he's not a member of the crew. I mean, he's not working for them, but he's not a member of the crew. That's what he said. It matches up. Why are they running license plates? We'd like to think we'd do a more thorough job in that area. I understand that the parking problem is that they don't want crew members to park on a certain side of the street because the neighbors don't like it when the streets get filled up. So the concern is that this person is going to say he's not a member of the crew, even though he is, just because he wants the easy parking space. That certainly is another explanation, Your Honor, and something I will adopt right now. Do you have anything else you want to say? Yes, Your Honor. Just going back to the situation, having a few minutes relating to the Monell claim, Your Honor. Just because you have a few minutes doesn't mean you have to use it. Well, if that's an indicator, Your Honor, I'd be more than happy to quit now. However, let me talk about the Monell claim for just one second. Again, the trial judge certainly did such a thorough analysis in her order and talks about the fact, one, that although Mr. Zanger was provided a form and asked if he wanted to waive it, he, in fact, did not waive his rights. But did he get the hearing? Pardon me? Did he get the hearing? He didn't get the hearing, but that was not as a result of Pasadena's responsibility. That was Mr. Zanger was transferred pursuant to the city's policy, which I think is outlined also as well within the pleadings. Based on medical conditions, the city of Pasadena's jail is not equipped to take care of individuals. Offhand, I can't understand what could be a problem with asking people if they want to waive rights. We have guilty pleas. We have... Actually, I have no difficulty with that as well, Your Honor. However, this was raised by Mr. Zanger. So we do need to address it. Just need to understand that, at least for this Court to understand that there was nothing that Mr. Zanger was asked to... There was no violation of his constitutional rights. He was not coerced to... Or attempted to be coerced. And more importantly, there was no evidence that he, in fact, was coerced or, in fact, that any other individual had been coerced. I mean, there was somewhere along the line a suggestion that he wasn't allowed to post bail. I mean, he was in jail on this for two and a half days or something. And he eventually posted bail. What happened? My understanding is that is the claim that was made. However, he was, in fact, entitled to make phone calls. I believe that was in the record. So... Why does the phone call have to do with it? Well, because that's how you arrange for... That's how you arrange for bail, Your Honor. Is you call your bail agent or your family member or somebody to arrange that. Yeah, but I don't understand the claim to be that he couldn't make a phone call. I understand to be they weren't going to let him out on bail. Oh, no, I don't believe that was the claim at all, Your Honor. I think it's the fact that he wasn't allowed to contact someone to make that... Okay. Thank you for your argument. Rebuttal? Thank you. Let me try to... I think all these questions were asked by Judge Berzon. He was in custody for 72 hours. He was unable to reach the people he needed to reach in his initial phone call and then was whisked off to the inmate reception center, which is very difficult. His bail was $20,000. It was never posted. The county jail asked for a McLaughlin determination of probable cause from the city and said they would have to release him if they didn't get it. They never did get it. However, after 72 hours, they released him on his own recognizance. That's what happened with that. In terms of the subtext, I think this is exactly what this case is about. The security officers, the off-duty Pasadena police officers, were told by the crew that they suspected Mr. Zanger was a photographer and they were... Do you have evidence of that? Yes, it's in the record, Your Honor. It's in their police report that the crew said, and it's in both our briefs. I could get the page. It's in there. We suspect that he is a paparazzi and that's what the crew told the police before they initiated the contact with Mr. Zanger. That's what this was all about. And Your Honor said, well, the story turned out to be 90% true. No, the story turned out to be 100% true. There were Virginia plates on the cars used in that episode. The person who was 10% wrong was Officer Carrillo, who told the officers that he thought they were Washington plates. Let's see, it's 2 EOR 56, which is the excerpt from the police report. It says, in fact, the film crew, quote, this is what the police reported, quote, guessed that the driver might be the paparazzi that had been snooping around the location the previous day. So that would be that indication. And unless the court has any other questions. I don't see any. Thank you, Your Honor. Both sides for their argument. The case just argued will be submitted for decision. We'll proceed to the next case on the argument calendar, which is Scott Lee Eggeberg versus the United States Trustee Peter C. Anderson. Counsel are present.
judges: Hawkins, Berzon, Clifton